**FILED**

**U.S. Bankruptcy Appellate Panel
of the Tenth Circuit**

**February 26, 2025**

**Anne Zoltani
Clerk**

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| IN RE MICHAEL JOSEPH ROBERTS, SR., <br><br> Debtor. <br><br>_____<br><br> MICHAEL JOSEPH ROBERTS, SR., <br><br> Appellant, <br><br> v. <br><br> HARVEY SENDER, Chapter 7 Trustee, PDC, LLC, TIMOTHY FLAHERTY, TIMOTHY KNEEN, and RIVIERA COUNTRY CLUB, S. DE R.L. C.V.S, <br><br> Appellees. | BAP No. CO-24-009 <br><br><br> Bankr. No. 22-10521 <br> Chapter 7 <br><br><br><br><br> OPINION |

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado

_____

Richard Podoll of Podoll & Podoll, P.C., Greenwood Village, Colorado (Robert C. Podoll of Podoll & Podoll, P.C., Greenwood Village, Colorado, on the brief), for Appellant.

Michael T. Gilbert of Allen Vellone Wolf Helfrich & Factor P.C., Denver, Colorado, for Appellee Harvey Sender, Chapter 7 Trustee and William Leone of Norton Rose Fulbright US LLP (Chad S. Caby of Womble Bond Dickinson (US) LLP, Denver, Colorado, on the brief), for Appellees PdC, LLC, Timothy Flaherty, Timothy Kneen, and Riviera Country Club, S. de R.L C.V.S.

_____

Before **MICHAEL**, **SOMERS**, and **THURMAN**, Bankruptcy Judges.

_____

**MICHAEL**, Bankruptcy Judge.

_____

*My experiences have taught me that things rarely improve
with a simple change of scenery.*[1]

This appeal represents the latest chapter in the long battle between Michael Joseph Roberts, Sr. ("Appellant" or "Roberts"), Timothy Flaherty ("Flaherty"), and Timothy Kneen ("Kneen") over ownership and control of real estate located in Mexico. The earlier chapters were written in state court, where Appellant fared rather poorly. Undaunted, Roberts sought a new day in a new place, namely the United States Bankruptcy Court for the District of Colorado. Roberts's foray into bankruptcy has not seen much improvement from his days in state court, with the conversion of his chapter 11 case to chapter 7, appointment of a bankruptcy trustee, and much to his chagrin, a resolution of this seemingly eternal battle by virtue of a settlement. Roberts takes great issue with the settlement and lodged this appeal in hopes that the battle might rage on. Unfortunately for Roberts, the settlement at issue falls well within the discretion of a chapter 7 trustee and was properly approved by a bankruptcy court after a fully developed evidentiary hearing.

---

[1] Pittacus Lore, https://quotefancy.com/quote/34516/Pittacus-Lore-My-experiences-have-taught-me-that-things-rarely-improve-with-a-simple (last visited Feb. 10, 2025).

## Background

Let us begin with an attempt to explain the complex web of corporate structures created when our players played nicely together. Initially, Roberts, Flaherty, and Kneen formed and subsequently managed PdC, LLC ("PdC" and collectively with Flaherty and Kneen, the "PdC Creditors"), a Colorado limited liability company, to serve as an investment vehicle for the development of beachfront property in Mexico. Mexican law prohibits foreign companies from owning land on Mexico's coast. In order to hurdle this obstacle, PdC formed Riviera Country Club, S. de R.L. C.V.S. ("RCC"), a Mexican entity, to own the lands purchased in Mexico. Roberts, Flaherty, and Kneen served as the managers of RCC. As part of the business model, PdC solicited investments from outside investors.[2]

*Acquisition of the Mexican Properties*

RCC purchased several parcels of land in Mexico. The first parcel, known as "Sereno I," was acquired by RCC for $8 million in 2006. In 2012, RCC acquired two more properties known as "Sereno II" and "Sereno III" (together the "Mustapha Properties") for an additional $11.5 million. RCC paid $6 million outright for the Mustapha Properties; the remaining $5.5 million of the purchase price was subject to a lien held by Hoteles Turisticos Unidos, S.A. ("HTUSA"). At the time of the purchase of the Mustapha Properties, the properties were subject to foreclosure litigation initiated by HTUSA. By purchasing the Mustapha Properties with the lien intact, RCC acquired the

---

[2] *Tr. of Denver District Court April 20 & 22, 2022 Hearing on Damages* at 164, *in* Appellant's Am. App. at 2075.

former owner's position as a defendant in the HTUSA foreclosure action. After purchasing the Mustapha Properties, RCC entered into a settlement agreement with HTUSA whereby HTUSA agreed to release its lien in exchange for $6.5 million: $1 million upon the signing of the settlement agreement, with the balance of $5.5 million due on February 29, 2016.[3]

RCC made an initial $1 million payment to HTUSA funded by two loans from the PdC Creditors. Thereafter, RCC struggled to pay the remaining amounts due and sought extensions. During this time, Roberts considered whether he "could skirt RCC and sign away their [Kneen and Flaherty's] rights and position by using [his] power of attorney[]" to obtain rights to property.[4] The PdC Creditors and Roberts discussed various options to fund the remaining amount due to HTUSA, including a loan from Flaherty to RCC, but Roberts objected and proposed loaning the remaining $5.5 million to RCC himself subject to certain conditions.[5] Flaherty and Kneen agreed to Roberts's proposal. Instead of making the payment on behalf of PdC or RCC, Roberts granted a power of attorney on RCC's behalf to his attorney in Mexico, who ratified a settlement agreement and effectuated Roberts's personal acquisition of the Mustapha Properties' lien from HTUSA in December 2016. Thereafter, Roberts attempted to foreclose on the Mustapha Properties and hired armed guards to take physical possession of the Mustapha Properties, Sereno I, and another beach property controlled by Roberts, Kneen, and

---

[3] *Expert Report of Carolyn Fairless* at 4, *in* Appellant's Am. App. at 1571.
[4] *Order Regarding April 20 & 22, 2022 Hearing on Damages* at 6, 11 ¶¶ 16, 31, *in* Appellees' App. at 423, 428.
[5] *Id.* at 7–8 ¶¶ 20–21, *in* Appellees' App. at 424–25.

Flaherty. The guards also denied Flaherty and Kneen access to these properties. Put another way, Roberts attempted to obtain the Mustapha Properties by means of an economic coup.

*The State Court Litigation*

In May 2015, a group of PdC investors commenced litigation (the "State Court Litigation") against Roberts, Kneen, Flaherty, PdC, and Carl Vertuca ("Vertuca"), who served as Chief Financial Officer of PdC, in state court (the "Denver District Court") alleging a variety of claims including fraud, negligence, negligent misrepresentation, unjust enrichment, and breach of fiduciary duty.

In October 2018, the PdC Creditors, as part of the State Court Litigation, filed a third-party complaint against Roberts alleging he engaged in a fraudulent scheme to misappropriate the rights of his partners in the Mexican land development venture.[6] The PdC Creditors obtained a preliminary injunction enjoining Roberts from taking any further action to misappropriate the PdC-owned properties in Mexico.[7] Roberts defied the injunction and transferred the PdC-owned properties to parties beyond the jurisdiction of the Denver District Court.

The Denver District Court was less than amused. On January 6, 2020, the Denver District Court found Roberts in violation of court orders, held him in contempt, and ordered Roberts to pay a fine of $1,000 per day and be jailed until he purged himself of

---

[6] *See Cross Claim and Third Party Complaint* at 11–19, *in* Appellees' App. at 96–104.

[7] *Tr. of Proceedings Held on December 6, 2018* at 52–55, *in* Appellees' App. at 106, 157–60.

the contempt.[8] Thereafter, the Denver District Court conducted a trial on the merits to decide the governance structure of PdC and RCC. On June 19, 2020, the Denver District Court entered a judgment determining Roberts had breached his fiduciary duty to the PdC Creditors by scheming to take HTUSA's position with respect to the Mustapha Properties.[9] On August 28, 2020, the Denver District Court granted the PdC Creditors' ex parte request for a writ of attachment to freeze Roberts's assets and again ordered Roberts taken into custody for contempt.

During the course of the State Court Litigation, Roberts treated legitimate discovery requests with the same respect he had shown to the injunctions entered by the Denver District Court. Once enough became enough, the Denver District Court entered a discovery sanctions order striking all of Roberts's defenses, dismissing his cross- and counter crossclaims, precluding him from introducing evidence he failed to produce in discovery, and entering a default judgment in favor of the PdC Creditors.[10]

In August 2021, the Denver District Court jailed Roberts for not purging his contempt[11] and ordered he remain incarcerated until he complied with the previous court orders and remedied his misappropriation of the PdC properties in Mexico. Roberts was eventually released, but the Denver District Court ordered him incarcerated yet again when he failed to purge his contempt. On October 6, 2021, the Denver District Court

---

[8] *Order Re: Contempt Citation issued to Michael J Roberts, Sr.* at 2–3, *in* Appellees' App. at 227–28.

[9] *See Findings of Fact and Conclusions of Law*, *in* Appellees' App. at 230.

[10] *Order Converting Chapter 11 Case to Chapter 7* at 4, *in* Appellees' App. at 27.

[11] Appellant's Br. at 13.

upheld the previously issued writ of attachment and found Roberts concealed himself and his assets in an effort to avoid service of process, defied court orders, and acted with an intent to hinder or delay his creditors.

The Denver District Court then set the damages trial for February 22, 2022. After some delays, the damages trial finally took place in the Denver District Court on April 20 and 22, 2022. On June 23, 2022, the Denver District Court entered a damages award (the "Damages Order") in favor of the PdC Creditors in the total amount of $21,124,986.37.[12] This included $10,456,162 in actual damages, $5,500,000 in exemplary damages, and $5,168,824 in prejudgment interest on the actual damages. In the Damages Order, the Denver District Court detailed Roberts's conduct and found Roberts prevented the PdC Creditors from selling certain of the Mexican properties as a bundle and caused a total loss with respect to the Mustapha Properties. The Denver District Court also awarded attorney's fees and expenses in the amount of $1,691,760 to the PdC Creditors.[13]

*The Bankruptcy Proceedings*

On February 18, 2022, Roberts, while still incarcerated for civil contempt of the Denver District Court, filed a petition for relief under chapter 11 of the United States Bankruptcy Code, thereby invoking the automatic stay in an effort to stop any further action in the Denver District Court. On March 25, 2022, after notice and a hearing, the PdC Creditors obtained relief from the automatic stay to conduct the damages trial in the

---

[12] Damages Order at 32, *in* Appellees' App. at 449.
[13] *Order Regarding Reasonableness and Necessity of Attorneys Fees Includable in Damages Award* at 16–17, *in* Appellees' App. at 465–66.

Denver District Court.[14] On May 12, 2022, the PdC Creditors again obtained relief from stay to proceed with enforcement of the Denver District Court's orders related to the preliminary injunction, writ of attachment, and civil contempt.[15]

On May 6, 2022, the PdC Creditors filed a *Motion to Convert Chapter 11 Case to Chapter 7* arguing Roberts filed the bankruptcy in bad faith.[16] After conducting an evidentiary hearing, the Bankruptcy Court issued an *Order Converting Chapter 11 Case to Chapter 7* (the "Conversion Order").[17] In doing so, the Bankruptcy Court ruled Roberts filed his bankruptcy case in bad faith in an attempt to relitigate and invalidate the judgments of the Denver District Court. Harvey Sender ("Sender" or "Trustee") was appointed to serve as chapter 7 trustee in the converted case. Roberts appealed the Conversion Order to the United States District Court for the District of Colorado, which affirmed the Bankruptcy Court's decision. The Conversion Order is final and not subject to further appeal.

Relevant to this appeal are the PdC Creditors' secured claims in the amount of $22.8 million (the "PdC Claim").[18] Roberts and his attorney, Robert Podoll ("Podoll"), objected to the PdC Claim.[19] A review of the objections filed by Roberts and Podoll

---

[14] *Order Granting Joint Motion to Approve Settlement Agreement* at 4, *in* Appellant's Am. App. at 2294.

[15] *Id.*

[16] *Motion to Convert Chapter 11 Case to Chapter 7*, Bankr. ECF No. 149.

[17] Conversion Order, *in* Appellees' App. at 24.

[18] *Proofs of Claim*, *in* Appellant's Am. App. at 20, 49, 78, 107.

[19] *See, e.g.*, *Debtor's Objection to Claim of PdC LLC (Proof of Claim 16)*, *in* Appellant's Am. App. at 136; *Joinder of Podoll & Podoll, P.C. in Debtor's Objection to Claim of PdC LLC (Proof of Claim 16)*, *in* Appellant's Am. App. at 390.

reveal them to be little or nothing more than a rehash of every reason why they could prevail on appeal in the State Court Litigation and thereby eviscerate the claims of the PdC Creditors.

After months of meaningful negotiation, the Trustee and PdC Creditors entered into a settlement agreement (the "Settlement Agreement") that, in relevant part, (1) allowed the PdC Claim in the amount of $19 million, (2) withdrew all remaining proofs of claim filed by the PdC Creditors and related entities, (3) released any security or lien interest the PdC Creditors had in property of the bankruptcy estate, (4) relinquished any appeal rights the Trustee had in the State Court Litigation, and (5) allowed for entry of a final judgment in the State Court Litigation in the amount of the PdC Creditors' allowed claim. The Settlement Agreement also included a list of the waterfall payouts (the "Waterfall Payouts") that accounted for how the PdC Creditors would compensate the bankruptcy estate over time.

On April 11, 2023, the Trustee and PdC Creditors filed a *Joint Motion to Approve Settlement Agreement* (the "Settlement Motion").[20] Roberts and Podoll objected to the Settlement Motion noting, in relevant part, the various issues they believed could be raised on appeal in the State Court Litigation (e.g., lack of standing, res judicata, lack of damages, setoff).[21] These objections are overwhelmingly, if not exclusively, focused on

---

[20] Settlement Motion, *in* Appellant's Am. App. at 773.

[21] *Debtor's Objection to Joint Motion to Approve Settlement Agreement*, *in* Appellant's Am. App. at 815; *Joinder of Podoll & Podoll, P.C. in Debtor's Objection to Joint Motion to Approve Settlement Agreement*, *in* Appellant's Am. App. at 893.

the issues raised in the State Court Litigation and determined by the Denver District Court. No other creditors objected to the Settlement Agreement.

On November 29, 2023, the Bankruptcy Court commenced a three-day evidentiary hearing on the Settlement Motion and the objections by Roberts and Podoll.[22] During the evidentiary hearing, the PdC Creditors presented testimony from the Trustee, Vertuca, and attorney and expert witness Carolyn Fairless ("Fairless"). The Trustee "viewed the bankruptcy filing as an attempt to forum shop and relitigate the state court decisions."[23] The Trustee testified he received and reviewed documentation from Podoll related to the State Court Litigation and concluded an appeal of the State Court Litigation would likely be unsuccessful "because of the *Rooker-Feldman* doctrine, but also because of the numerous sanctions orders entered against Roberts."[24] The Trustee hired Fairless as an expert witness "to assist in determining the value of the appeal rights" "because the principal disputed asset was the appeal rights that the estate held for all of Roberts'[s] adverse rulings,"[25] The Bankruptcy Court noted the Trustee "exhibited a business-like approach to the resolution of the case."[26]

---

[22] *Tr. of Hybrid In-Person and Video Evidentiary Hearing Regarding the Trustee and PdC Creditors' Joint Motion to Approve Settlement Agreement (Docket 540), Debtor's Objection (Docket 573), and Podoll & Podoll, P.C.'s Joinder in Debtor's Objection (Docket 574)*, *in* Appellant's Am. App. at 2332.

[23] *Order Granting Joint Motion to Approve Settlement Agreement* at 9, *in* Appellant's Am. App. at 2299.

[24] *Id.* (italicization added).

[25] *Id.*

[26] *Id.*

Fairless, an experienced litigator and a recognized expert "in evaluating the settlement of ongoing litigation," testified that an "appeal of the Denver District Court's ruling" in the State Court Litigation "would fail."[27] In doing so, Fairless discussed each of the potential appellate issues identified by Roberts and Podoll "and testified to why they would fail."[28] Fairless also "testified that the serious contempt sanctions, the low credibility of Roberts, and the failure of previous appeals by Roberts were relevant in determining the probability of success of the . . . appeal."[29] "Ultimately, Fairless stated she gave [Roberts's] appeal before the Colorado Court of Appeals a '10–20%' chance of success."[30] The Bankruptcy Court found "Fairless'[s] testimony [ ] credible, studied, and persuasive."[31]

Roberts and Podoll presented testimony from Flaherty and attorney and expert witness Stanley Garnett ("Garnett"). There is a marked difference between expertise and persuasion, as revealed by the Bankruptcy Court's analysis of Garnett's testimony:

> Earlier in the state court litigation, Garnett was retained as an expert witness for the PdC Creditors when he testified on their behalf that legal fees in prosecuting the case against Roberts were reasonable. However, he believes the issues before this Court are sufficiently different from his past testimony that he does not have a conflict of interest. He consulted with Podoll about a potential conflict, and Podoll agreed with this assessment. This Court has never seen an expert witness testify for both sides in the same case.[32]

\*\*\*

---

[27] *Id.* at 11, *in* Appellant's Am. App. at 2301.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* at 12, *in* Appellant's Am. App. at 2302.
[32] *Id.*

11

On cross-examination, Garnett admitted he is not an expert on Mexican law, civil procedure, or foreclosure procedure and is not admitted to practice in Mexican courts. He also admitted that he did not analyze the reasonableness of the Agreement before the Court. Garnett agreed that it is difficult to reverse decisions on appeal when the appellant has lost at the trial level. Much of his report was based on interviews with the Podoll firm. His opinion on the appellate issues was not based on his review of the Denver District Court file or transcripts, nor did he consult with the chapter 7 Trustee or the PdC Creditors' counsel.[33]

\*\*\*

The Court discounts and disregards Garnett's opinion. Notwithstanding the conflict issue, the foundation of his report was lacking and paled in comparison to the comprehensive analysis presented by Fairless. He never supported his opinion as to why the finding of breach of fiduciary duty was erroneous, never discussed the lack of notice to PdC in Mexico, and never explained how the Court of Appeals would react to Roberts'[s] litigation misconduct.[34]

\*\*\*

The Joint Movants' expert, Fairless, provided competent and thoroughly cited research. Her review of the record was extensive, and the documents she relied on were identified in her report, as required by Fed.R.Civ.P. 26(a). She provided concrete reasoning on why she believed the appeal had a low chance of success. The charts regarding the summary of Roberts'[s] arguments and his lack of credibility persuade the Court that her opinion was grounded in fact. Her testimony is key to this Court's opinion that the appeal has a negligible chance of success.

In contrast, Garnett did not appear confident in his summary conclusions. He failed to explain why he believed that the Denver District Court's decision that the assignment of the lien was a breach of fiduciary duty was incorrect. Further, he changed sides during the case.[35]

---

[33] *Id.* at 13, *in* Appellant's Am. App. at 2303.
[34] *Id.*
[35] *Id.* at 17, *in* Appellant's Am. App. at 2307.

Put simply, the Bankruptcy Court did what every trial court does when considering differing expert opinions: it reviewed the experts' testimony, analysis and the depth thereof, the written reports, the weaknesses exposed on cross-examination, and the demeanor of each to reach a conclusion about which opinion was more credible. The Bankruptcy Court's decision to rely upon Fairless and reject Garnett is well reasoned, supported by the record, and largely unremarkable.

On March 28, 2024, the Bankruptcy Court entered its *Order Granting Joint Motion to Approve Settlement Agreement* (the "Settlement Order").[36] In the Settlement Order, the Bankruptcy Court concluded the following factors weighed in favor of approving the Settlement Agreement: (1) "the extremely low probability of success" of an appeal in the State Court Litigation;[37] (2) the complexity and expense of the State Court Litigation, as well as the fact Roberts's conduct was a "major cause" of that complexity and expense;[38] (3) Podoll and his firm were the only creditor to object to the Settlement Agreement;[39] (4) "[t]he team of Roberts and Podoll desire[d] to litigate ad infinitum";[40] and (5) "Podoll [wa]s so 'hopelessly conflicted' that [the Bankruptcy Court] ha[d] a hard time believing anything [he] sa[id]."[41]

This appeal followed.

---

[36] *Id.* at 1, *in* Appellant's Am. App. at 2291.
[37] *Id.* at 17, *in* Appellant's Am. App. at 2307.
[38] *Id.* at 18, *in* Appellant's Am. App. at 2308.
[39] *Id.*
[40] *Id.*
[41] *Id.*

## Jurisdiction

The BAP has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit"), unless a party elects to have the district court hear the appeal.[42] The Settlement Order is a final order.[43] Roberts timely filed his notice of appeal. None of the parties elected to have the district court hear the appeal. Accordingly, this Court has jurisdiction to hear this appeal.

## Standard of Review

We review a bankruptcy court's approval of a settlement for an abuse of discretion.[44] Under the abuse of discretion standard, we will not disturb a bankruptcy court's decision unless we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."[45] "An abuse of discretion occurs when the [bankruptcy] court's decision is 'arbitrary, capricious or whimsical,' or results in a 'manifestly unreasonable judgment.'"[46] The Tenth Circuit has held that we should "affirm a bankruptcy court's

---

[42] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[43] *Loyd v. Foxglove, Inc. (In re S. Med. Arts. Cos.)*, 343 B.R. 250, 254 (10th Cir. BAP 2006).

[44] *Id.* at 256.

[45] *In re Arenas*, 535 B.R. 845, 849 (10th Cir. BAP 2015) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)).

[46] *Moothart*, 21 F.3d at 1504–05 (quoting *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987)).

approval of a settlement unless we find it either lacking in evidentiary support or disconnected to the evidence in the record."[47]

## Statement of Issues

Roberts raises three issues on appeal:

1. Whether the [Bankruptcy] Court abused its discretion in approving the settlement of the Creditors' bankruptcy claims [(a)] without considering the setoff to which the debtor was entitled and [(b)] before resolving the claim objections[.]

2. Whether the [Bankruptcy] Court abused its discretion in approving the settlement of the State Court litigation and incorrectly applied the *Kopexa* factors, specifically, the probable success of the underlying litigation on the merits, in approving the settlement agreement.

3. Whether the Bankruptcy Court erred in failing to consider the fairness of the settlement agreement to the debtor and the estate.[48]

Boiled to their essence, each of these issues raises one overarching question: did the Bankruptcy Court abuse its discretion when it entered the Settlement Order?

## Discussion

*Settlement Agreements in Bankruptcy*

Federal Rule of Bankruptcy Procedure Rule 9019 ("Rule 9019") authorizes a chapter 7 trustee to expeditiously close a debtor's bankruptcy estate by entering into compromises or settlements.[49] As a general rule, "settlements are favored in

---

[47] *Kearney v. Unsecured Creditors Comm.*, 987 F.3d 1284, 1295 (10th Cir. 2021).
[48] Appellant's Br. at 7.
[49] Fed. R. Bankr. P. 9019. Rule 9019 governs settlement agreements and provides, in relevant part, "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement." *Id.*

bankruptcy."[50] Neither Rule 9019 nor the Bankruptcy Code contains a standard for evaluating compromises or settlements. In the Tenth Circuit, "[a] court's general charge is to determine whether the settlement is fair and equitable and in the best interests of the estate,"[51] and, as the court makes that determination, it should "review the issues and determine whether the settlement falls below the lowest point in the range of reasonableness."[52]

In evaluating whether a compromise or settlement is fair, equitable, and in the best interest of the estate, we have long considered four factors: (1) "the probable success of the underlying litigation on the merits"; (2) "the possible difficulty in collection of a judgment"; (3) the complexity and expense of the litigation"; and (4) "the interests of creditors in deference to their reasonable views."[53] We shall refer to these collectively as the *Kopexa* factors.

---

[50] *Kearney*, 987 F.3d at 1295. As every bankruptcy judge and litigator knows, settlements should be favored everywhere.

[51] *In re Rich Glob., LLC*, 652 F. App'x 625, 631 (10th Cir. 2016) (unpublished) (citing *In re W. Pac. Airlines, Inc.*, 219 B.R. 575, 579 (D. Colo. 1998)).

[52] *Id.* (citing William L. Norton, Jr. and William L. Norton III, 8 *Norton Bankruptcy Law & Practice* § 167:2 (3d ed. 2011)).

[53] *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997). *See also In re Ruiz*, No. 23-006, 2023 WL 5201671, at *5 (10th Cir. BAP Aug. 14, 2023) (unpublished); *In re Velasquez*, No. 18-076, 2019 WL 2511557, at *5 (10th Cir. BAP June 18, 2019) (unpublished); *In re Whiting*, 329 B.R. 358, at *3 (10th Cir. BAP Aug. 3, 2005) (unpublished).

*The First* Kopexa *Factor: Likelihood of Success*

At trial and on appeal, Roberts focused on one major issue: his ability to reverse

the Damages Order in the appellate courts of Colorado.[54] Roberts acknowledges "[t]he

Bankruptcy Court applied the *Kopexa* factors" in approving the Settlement Agreement.[55]

He argues, however, the Bankruptcy Court "incorrectly applied"[56] the first *Kopexa* factor,

which, as we have noted, concerns the probable success of the underlying litigation on

the merits.[57] Roberts argues the Bankruptcy Court "summarily . . . dispensed with the

myriad of State Court errors that can and should be addressed on appeal" on the grounds

that Roberts lacked credibility and had engaged in misconduct during the litigation.[58]

Roberts contends "none of the appellate issues rely on [his] 'credibility' or depend on an

appellate court excusing his alleged 'litigation misconduct.'"[59]

We find the argument unpersuasive. Additionally, none of the other *Kopexa*

factors are discussed by Roberts, although they were considered by the Bankruptcy Court

---

[54] In his opening brief, Roberts devotes three pages to the argument that setoff rights exist in bankruptcy cases, and approximately twenty pages to the proposition that the Denver District Court got it all wrong and would be reversed on appeal. The reply brief continues along the same tone, almost begging this Court to stand as an appellate court when it comes to the Denver District Court litigation.

[55] Appellant's Br. at 14.

[56] *Id.* at 7; *see id.* at 22 ("The Bankruptcy Court summarily dismissed the first *Kopexa* factor in approving settlement of the State Court litigation.").

[57] Appellant also argues in his reply brief that his appellate rights are not property of the estate. We deem this issue waived. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994) ("[A]ppellate courts will not entertain issues raised for the first time on appeal in an appellant's reply [brief].").

[58] Appellant's Br. at 22. According to Appellant, the appellate issues "implicate (1) due process, (2) the trial court's failure to hold a trial on liability, (3) jurisdiction, (4) res judicata, and (5) Claimants' inability to prove damages." *Id.*

[59] *Id.*

17

in the Settlement Order. As no error has been raised regarding the other *Kopexa* factors, we need not review them.

In addressing the first *Kopexa* factor, the Bankruptcy Court heard from the Trustee, Fairless, and Garnett. After hearing the testimony and observing the witnesses' demeanor while testifying, the Bankruptcy Court found credible and placed significant reliance on the testimony of the Trustee and Fairless and found Garnett's testimony unpersuasive. The Bankruptcy Court acted well within its provinces. Assessment of witness credibility is a matter left to the province of every trial court.[60] Nothing in the record convinces us the Bankruptcy Court committed any error, let alone clear error, in finding Fairless to be a credible witness and relying upon her analysis and conclusions as it approved the Settlement Agreement.

The Trustee "did not believe Roberts'[s] appeal had the potential to succeed primarily because of the *Rooker-Feldman* doctrine, but also because of the numerous sanctions orders entered against Roberts."[61] The Trustee hired Fairless "because the

---

[60] *See In re Harmsen*, 320 B.R. 188, 200–01 (10th Cir. BAP 2005) ("This panel shall give due regard to the bankruptcy court in judging the credibility of the witnesses as related to the evidence. Where, as here, the evidence is plausible in light of the record viewed in its entirety, an appellate court may not reverse the findings of the bankruptcy court 'even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' Moreover, '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'") (internal citations omitted).
    Indeed, while Roberts goes to some length to suggest the Bankruptcy Court should have rejected Fairless's testimony, he fails to mention Garnett in the briefs filed before this Court. Given the resounding rejection of Garnett's opinions by the Bankruptcy Court, it is easy to understand why Roberts chose not to rely upon Garnett's opinions when arguing before this Court.
    [61] Settlement Order at 9, *in* Appellant's Am. App. at 2299 (italicization added).

18

principal disputed asset was the appeal rights that the estate held for all of Roberts'[s] adverse rulings" and the Trustee wanted Fairless "to assist in determining the value of th[os]e appeal rights."[62] Fairless was a seasoned litigator who had experience "in evaluating the settlement of ongoing litigation."[63] Fairless prepared and submitted to the Bankruptcy Court a sixty-two page expert report that included "a comprehensive and academic examination of the" potential appeal issues.[64] Those issues included "Standing, Res Judicata, Due Process, No Damages, No Usurpation, Setoff, Lack of Jurisdiction over RCC through Lack of Subject Matter Jurisdiction, False Allegations, [and] Attorney's Fees."[65] Fairless testified regarding her findings and opined that Roberts's "appeal before the Colorado Court of Appeals" had "a '10–20%' chance of success."[66] The Bankruptcy Court found "[t]he cross-examination" of Fairless by Roberts's attorney "did not expose any weaknesses in her opinion," and her "testimony was credible, studied, and persuasive."[67] The Bankruptcy Court in turn concluded, in analyzing the first *Kopexa* factor, that Roberts's "probability of success on appeal [wa]s negligible."[68]

While Roberts argues Fairless, and in turn the Bankruptcy Court, based their analysis of the probability of success solely on the grounds that Roberts lacked credibility

---

[62] *Id.*
[63] *Id.* at 11, *in* Appellant's Am. App. at 2301.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.* at 11–12, *in* Appellant's Am. App. at 2301–02.
[68] *Id.* at 16, *in* Appellant's Am. App. at 2306.

19

and had engaged in misconduct during the litigation, the record demonstrates otherwise.[69]

To be sure, both Fairless and the Bankruptcy Court considered Roberts's lack of credibility and misconduct. Fairless, for her part, noted that "every Denver District Court judge whom [Roberts] appeared in front of has made credibility determinations adverse to him," and she opined that "[t]hese credibility determinations will be effectively unassailable on appeal."[70] But that was far from the end of Fairless's analysis. She also noted Roberts "was contemptuous of the legal system, repeatedly refused to comply with court orders, . . . repeatedly took action to try to circumvent those orders," and had already filed multiple unsuccessful appeals.[71] Fairless also addressed in detail each of the categories of potential appeal issues, including standing, jurisdiction, res judicata, due process, lack of damages, usurpation, setoff, false allegations, and attorney's fees, and concluded that all of them had a low probability of success.[72]

The Bankruptcy Court noted "Roberts'[s] lack of credibility and flagrant disregard of prior court orders . . . play[ed] a large part in [its] analysis" of the first *Kopexa* factor.[73] More specifically, the Bankruptcy Court concluded "that Roberts'[s] history of judgments and decisions against him by the Denver District Court, taken with the sanctions and non-existent credibility, indicate[d] only a small likelihood of success on

---

[69] Notably, Appellant makes no attempt to challenge the Bankruptcy Court's findings that Fairless's testimony was credible, studied, and persuasive.

[70] *Expert Report of Carolyn Fairless* at 44, 46, *in* Appellant's Am. App. at 1611, 1613.

[71] *Id.* at 44, *in* Appellant's Am. App. at 1611.

[72] *Id.* at 48–61, *in* Appellant's Am. App. at 1615–28.

[73] Settlement Order at 16, *in* Appellant's Am. App. at 2306.

20

appeal."[74] But the Bankruptcy Court also, in analyzing the first *Kopexa* factor, agreed with Fairless's analysis of each of the potential appellate issues.[75] Ultimately, the Bankruptcy Court concluded "the probability of success on appeal [wa]s negligible."[76]

Importantly, the Bankruptcy Court's obligation under *Kopexa* was not to serve as a de facto appellate court by addressing each of the potential appellate issues in detail. Instead, the Bankruptcy Court's task was to consider the probability of success of each of the potential appellate issues. After reviewing the record on appeal, we have little trouble concluding that the Bankruptcy Court properly fulfilled this task and did not abuse its discretion by finding Fairless's testimony credible and in turn adopting her opinions regarding the likelihood of success of the potential appellate issues.

*The "Right" to Setoff and the Claim Objection*

At the risk of overkill, let us take a moment to further discuss the alleged right to setoff and the unlitigated claim objection upon which Roberts places so much reliance.

*Setoff*

The right to setoff is a well-established principle grounded in fairness and equity that "'allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'"[77] A discretionary right to setoff in bankruptcy exists when (1) a creditor owes a prepetition

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank of Bos.*, 229 U.S. 523, 528 (1913)).

debt to the debtor, (2) the creditor has a prepetition claim against the debtor, and (3) the creditor's and the debtor's obligations are mutual.[78] The "mutuality requirement mandates that the debts involved be between the same parties standing in the same capacity, and that each debt be valid and enforceable."[79]

Roberts claims that the Bankruptcy Court incorrectly disregarded a $24,975,845.69 right to setoff, which could have been used under 11 U.S.C. § 558 to totally eliminate the PdC Claim.[80] Roberts argues the Bankruptcy Court's failure to consider this setoff unjustly enriches the PdC Creditors at the expense of other creditors and the estate. Roberts contends, based on Vertuca's testimony during the evidentiary hearing, the PdC Creditors admitted PdC owed Roberts $24,975,845.69.[81] Roberts maintains the Settlement Order failed to discuss the setoff defenses and argues the setoff would extinguish the PdC Claim entirely. Finally, Roberts asserts that setoff would benefit the bankruptcy estate and that approving a settlement which denies a right to setoff allows the PdC Creditors to take preference over other creditors.

The argument is a red herring, and a small one at that. The "right" to setoff Roberts relies upon does not belong to Roberts; instead, it is the "property of the

---

[78] *In re Myers*, 362 F.3d 667, 672 (10th Cir. 2004).

[79] *In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990) (internal citations omitted).

[80] 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.").

[81] Settlement Order at 8, *in* Appellant's Am. App. at 2298.

22

bankruptcy estate."[82] Moreover, an alleged right to setoff is not created by the

Bankruptcy Code nor does it arise out of whole cloth; it must exist independently outside

of bankruptcy.[83] Any setoff rights Roberts claims have been effectively disposed of and

rejected in the State Court Litigation. For this elusive right to setoff to raise itself from

the dead, the rulings of the Denver District Court must be set aside on appeal in Colorado

state court, a task that, in the eyes of the Bankruptcy Court, Sender, and Fairless, is

realistically impossible. Relying on ample evidence, the Bankruptcy Court determined

any likelihood of successfully appealing and thus reviving any right to setoff was

"extremely low,"[84] which leads to the conclusion that, as a matter of the realities of the

---

[82] *Kaler v. Craig (In re Craig)*, 144 F.3d 593, 596 (8th Cir. 1998); *Scherling v Hellman Elec. Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739–40 (Bankr. S.D.N.Y. 1995) ("Section 558 of the Bankruptcy Code also preserves **for the benefit of the estate** any right to setoff the debtor may have.") (emphasis added) (footnote and citations omitted).

[83] 11 U.S.C. § 558; *In re Myers*, 362 F.3d at 672; *In re RCS Cap. Dev., LLC*, No. 12-1381, 2013 WL 3618550, at *8 (9th Cir. BAP July 16, 2013); *In re Eletson Holdings, Inc.*, 665 B.R. 223, 259 (Bankr. S.D.N.Y. 2024) ("While Wilmington does not address this argument, the Court disagrees with the Debtors. Bankruptcy Code Section 558 preserves for a Debtor's estate 'the benefit of any defense available to the debtor as against any entity other than the estate,' including setoff rights. However, the availability of setoff rights is determined under state law.") (internal citations omitted); *In re Westchester Structures, Inc.*, 181 B.R. at 739–40.

[84] Settlement Order at 17, *in* Appellant's Am. App. at 2307. The entirety of Fairless's discussion on the topic of setoff is worth repeating here:

> Roberts did not assert setoff as an affirmative defense in his answer. He first raised this defense in his motion for new trial. (Motion for New Trial, dated March 28, 2023.)
>
> Under Colorado common law, setoff is an affirmative defense that generally must be pleaded as such, or else it is deemed waived. *Marso v. Homeowners Realty, Inc.*, 2018 COA 15M, 418 P.3d 542, 545 n.4,

case, there were no setoff rights in existence as a matter of state law. We are not persuaded the Bankruptcy Court abused its discretion as it reached this conclusion. To the contrary, we find that the Bankruptcy Court got it right.

*The Claim Objection*

As it approved the Settlement Agreement, the Bankruptcy Court determined any objections to the PdC Claim were rendered moot by the Settlement Order, rendering unnecessary any analysis of the arguments asserted in Roberts's claim objection. Roberts now argues failure to adjudicate his objection to the PdC Claim was reversible error relying upon 11 U.S.C. § 502(b). That subsection governs proofs of claims and provides, in relevant part, that if a party objects to a proof of claim, the bankruptcy "court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount . . . ."[85] According to Roberts, any and every claim objection must be adjudicated prior to settlement. In this case, Roberts contends PdC admitted to owing

_____

*amended on denial of reh'g* (Mar. 22, 2018) (*citing Ochoa v. Vered*, 212 P.3d 963, 972 (Colo. App. 2009)).

Because Roberts neither pleaded setoff as an affirmative defense nor raised it before trial, an appellate court is not likely to consider it. Moreover, the sanctions order striking Roberts'[s] answer provides an independent basis for affirmance, as discussed above regarding Roberts'[s] res judicata defense. Thus, even if Roberts had properly pleaded setoff, he likely would be precluded from raising that defense due to the sanctions order.

*Expert Report of Carolyn Fairless* at 60, *in* Appellant's Am. App. at 1627 (footnote omitted). Fairless concluded that Roberts's setoff argument was likely dead on arrival in the state appellate courts. The Bankruptcy Court saw no error in Fairless's conclusion. Neither do we, nor do we see any error in the Bankruptcy Court's determination that Fairless was a credible witness.

[85] 11 U.S.C. § 502(b).

Roberts, and thus the bankruptcy estate, thereby requiring resolution of the claim objection based on the setoff defense.[86] Roberts also asserts, with no explanation or authority, that res judicata provides a complete defense against the PdC Claim. Thus, Roberts argues, the Bankruptcy Court abused its discretion in entering the Settlement Order because it failed to first adjudicate the claim objection, which contained complete defenses against the PdC Claim. He is wrong.

This exact issue was addressed by the United States District Court for the District of Colorado in *In re DVR, LLC*.[87] The facts of *DVR* are strikingly akin to the case at bar.[88] In that case, three individuals formed a limited liability corporation for the purpose of land development in New Mexico. Disputes arose, and litigation alleging, among other things, breach of fiduciary duty and fraud, was commenced in Colorado state court.[89] Eventually, DVR and a related entity found their way to bankruptcy court, where Hamon, a disgruntled minority shareholder in DVR, sought to equitably subordinate a claim held by another creditor, New Lake LLC. While the adversary proceeding between Hamon and New Lake LLC was pending, the bankruptcy trustees in the two cases negotiated a settlement with New Lake LLC, which granted New Lake LLC a secured claim against DVR. Hamon objected to the settlement, and, after a two-day evidentiary hearing, the bankruptcy court overruled Hamon's objection and approved the settlement. Hamon

---

[86] As noted *supra*, any setoff defense available to the estate was extinguished by the Denver District Court.

[87] 606 B.R. 80 (D. Colo. 2019).

[88] Those of us who cut our legal teeth in Nebraska would refer to *DVR* as a "cow case," as it is on all fours with the case presently before us.

[89] *In re DVR, LLC*, 606 B.R. at 82.

25

appealed, arguing in part that the bankruptcy court erred in approving the settlement without resolving Hamon's objection/equitable subordination claim against New Lake LLC. After a lengthy analysis of the issue, the District Court affirmed, expressly holding that "the Bankruptcy Court did not err in ruling that it could approve the Trustees' settlement with New Lake under Rule 9019 without first resolving Hamon's objections to the New Lake Claim through the Adversary Proceeding."[90] There is no substantive difference between *DVR* and this case, and the analysis contained in *DVR* provides for the same result here as there: affirmance of the Bankruptcy Court's decision to approve the Settlement Agreement.

Post *DVR*, the Tenth Circuit has recognized a distinction between "a claim objection that only disputes a creditor's entitlement to a distribution from an estate or its assets" and "a claim objection that involves the individual rights of the objecting creditor."[91] According to the Tenth Circuit, only the latter type of claim need be considered by the Bankruptcy Court before approving a settlement.[92] As noted, the objections filed by Roberts and Podoll are a mere recital of every reason they would prevail on appeal in the State Court Litigation and thereby eviscerate the claims of the PdC Creditors in the process. As we have noted, any rights of appeal in the State Court Litigation belong to Sender. Those rights have absolutely nothing to do with any claim

---

[90] *Id.* at 87.
[91] *In re Fog Cap. Retail Invs. LLC*, No. 22-1297, 2024 WL 659559, at *6 (10th Cir. Feb. 16, 2024) (quoting *In re DVR*, 606 B.R. at 85) (internal brackets omitted) (unpublished).
[92] *Id.*

26

rights of Podoll, or any rights now held by Roberts in his individual capacity. Moreover, any claim that the Bankruptcy Court did not thoroughly consider the value of those appeal rights as it approved the Settlement Agreement is abjectly absurd. We therefore conclude, consistent with Tenth Circuit precedent, that the Bankruptcy Court was not required to adjudicate Podoll's or Roberts's claim objection.

## Conclusion

The Bankruptcy Court did not abuse its discretion in approving the Settlement Agreement. Accordingly, we AFFIRM the decision of the Bankruptcy Court.